**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-mj-8481-RMM**

**IN RE SEALED COMPLAINT**

_____/

FILED BY_____MEE_____D.C.

**Jun 23, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?_No

3. Did this matter involve the participation of or consultation with now Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

5. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? No

JASON REDING QUIÑONES
UNITED STATES ATTORNEY

By: _____

*Adam C. McMichael*

Adam McMichael
Assistant United States Attorney
FL Bar 0772321
500 South Australian Ave, Suite 400
West Palm Beach, Florida
Tel: (561) 209-1040
Email: adam.mcmichael@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Joseph Denmark et al, | ) | Case No.   26-mj-8481-RMM |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

FILED BY_____MEE_____D.C.

**Jun 23, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 2026 _____ in the county of _____ Palm Beach _____ in the _____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 933(a)(3) | Conspiracy to transfer firearms to another person by Joseph Denmark, Derick Julien, and Antony Stokes; |
| Title 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm by Joseph Denmark and Deonte Harry. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Justin Herzlich, ATF
*Printed name and title*

Sworn and Attested to me by Applicant by Telephone (FaceTime) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date: 6/23/26

_____
*Judge's signature*

City and state:   West Palm Beach, FL      Hon. Ryon M. McCabe, U.S. Magistrate Judge
*Printed name and title*

**<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>**

I, Justin Herzlich, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since approximately 2007. Some of my responsibilities include investigating violations of federal law, including the Gun Control Act. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that, I am empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18 of the United States Code.

2.      This affidavit is being submitted in support of a criminal complaint that charges:

(a)      Joseph DENMARK ("DENMARK"), Derick JULIEN ("JULIEN) and Antony STOKES ("STOKES") with a violation of Title 18, United States Code, Sections 933(a)(3) and (1) (conspiracy to traffic firearms and trafficking firearms), and

(b)      DENMARK and Deonte HARRY ("HARRY") with a violation of Title 18, United States Code, Section 922(g)(1) (possession of a firearm and/or ammunition by a convicted felon).

3.      As an ATF agent, I have conducted and participated in numerous investigations concerning violations of federal firearm laws, violations of federal controlled substance laws, and the commission of violent crimes. Throughout my duties as a Special Agent, I have developed a growing knowledge of firearms laws and the methods and tactics used by individuals to acquire, transfer, sell, and possess firearms illegally.  I have also received training in the identification, classification and origin of where firearms and ammunition were manufactured.

4.      I submit this Affidavit based on information known to me personally from the investigation, as well as information obtained from others who have investigated the matter or have personal knowledge of the facts herein. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, it does not include every fact known to me about this matter.

<b><u>Firearm Trafficking</u></b>

5.      I know based upon my training and experience, as well as the training and experience of other ATF agents involved in this investigation, that it is unlawful to dispose of firearms to other individuals involved in criminal activity.  More specifically, Title 18, United States Code, Section 933(a)(1), makes it unlawful to ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if the subject knows or has reasonable cause to believe that the use, carrying, or possession of the firearm by the recipient would constitute a felony.  Additionally, Title 18, United States Code, Section 933(a)(3) prohibits attempts and conspiracies to violate Section (a)(1).

6.      I also know through my training and experience, as well as the training and experience of other ATF agents involved in this investigation, that it is unlawful for any person, who is not a licensed firearm dealer, to transfer, sell, trade, give, transport, or deliver any firearm to another person, who is also not a licensed firearm dealer, but who resides in a different state. More specifically, Title 18, United States Code, Section 922(a)(5), prohibits any  person (other than a licensed importer, manufacturer, or licensed dealer) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, manufacturer, or licensed

dealer) who the transferor knows or has reasonable cause to believe does not reside in the State in which the transferor resides.

7.     I also know based upon my training and experience, as well as the training and experience of other ATF Agents involved in this investigation, that it is unlawful for anyone to sell a firearm to a prohibited person, including a convicted felon. More specifically, Title 18, United States Code, Section 922(d)(1), prohibits the sale and disposition of a firearm and ammunition to any person, knowingly or with reasonable cause to believe, that such person has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year.

8.     Additionally, I know based upon my training and experience, as well as the training and experience of other ATF Agents involved in this investigation, that it is unlawful to deal in firearms without a license (18 U.S.C. § 922(a)(1)(A)), smuggle goods from the United States (18 U.S.C. § 554), and to export defense articles, including firearms, without a license (Title 22, United States Code, Sections 127.1(a)(1), 121.1(b), and 2778(c).

9.     I submit, based upon the facts and circumstances described below, that there is probable cause to believe that DENMARK, JULIEN and STOKES, conspired, attempted and did commit the offense of trafficking in firearms because DENMARK, JULIEN and STOKES believed the person, that is an undercover agent, whom DENMARK, JULIEN and STOKES sold firearms to was a felon, and whom they knew intended to smuggle the firearms to individuals who resided outside the state of Florida, and the United States, that is, Canada – all of which are felony offenses.

**PROBABLE CAUSE**

10.     In or around May 2026, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agents (SA) received information from ATF Confidential Informant (CI)[1] 9725 regarding DENMARK who advised the CI that he had fentanyl and firearms for sale in West Palm Beach, Palm Beach County, Florida.  ATF CI advised law enforcement they met DENMARK on the morning of May 4, 2026, in the area of 5th Street in the West Palm Beach area. DENMARK then asked CI 9725 to drive him to another location located at 617 5th Street, West Palm Beach, Florida, which is known to law enforcement as a residence related to narcotics distribution in the area. DENMARK also advised he can provide "poles"[2] to the ATF CI.  DENMARK also had the CI 9725 drive by another address located on 7th Street in the West Palm Beach area, where he indicated that was his "plug" for fentanyl. DENMARK then provided CI 9725 with his phone number as (\*\*\*)-\*\*\*-8316.

11.     CI later provided law enforcement with this information and with photos of DENMARK. Through database queries, law enforcement was able to identify this individual as Joseph DENMARK, a previously convicted felon.

**Undercover Purchase of firearm from DENMARK and FNU LNU on May 4, 2026**

12.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency)

---

[1] The information the CI has provided to law enforcement agents has been deemed credible and corroborated by independent evidence. The CI is a convicted felon and is solely being paid for their information.

[2] "Poles" are a slang street term used when referring to "firearms".

for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.

13.     The transaction was arranged through telephone calls and text messages between CI 9725 and DENMARK, using DENMARK's number (***)***-8316. These conversations took place on May 4, 2026.

14.     On May 4, 2026, at approximately 6:01 PM, SA 4860 and CI 9725 departed from the pre-determined staging location in an undercover vehicle (UCV) and activated the recording equipment. At approximately 6:09PM, SA 4860 and CI 9725 arrived at 617 5th St, West Palm Beach, Florida, and parked across the street from the residence. SA 4860 observed several unknown black males standing in the driveway of the residence. CI 9725 exited the UCV and made contact with some of the individuals. CI 9725, returned to the UCV and advised SA 4860 that they could either complete the transaction inside the residence or in the vehicle. SA 4860 advised that he wished to conduct the transaction inside of the UCV. CI 9725 entered the front door of the residence. CI 9725 then exited the residence, with FNU LNU.  FNU LNU exited the residence carrying a golf bag and a duffle style bag.  CI 9725 and FNU LNU approached the UCV. FNU LNU placed the duffle bag on the backseat and advised that the bag contained rifle magazines. FNU LNU then placed the golf bag in the rear seat of the UCV.

15.     FNU LNU removed a shotgun from inside of the golf bag. SA 4860 grabbed the shotgun and examined it. FNU LNU attempted to open the shotgun, with no luck. SA 4860 asked FNU LNU if he could provide more firearms for sale in the future.  FNU LNU stated that he could. SA 4860 asked what the total price was, CI 9725 stated $250.00, and FNU LNU agreed. SA 4860 counted $260.00 and provided it to FNU LNU   SA 4860 asked about a jet ski that the individuals had for sale. SA 4860 exited the UCV and entered the residence.  SA 4860 observed another black

5

male, and an unknown female. SA 4860, CI 9725, FNU LNU and the other black male, walked through the residence.  SA 4860, CI 9725 and the other black male, went to the back yard where the other black male showed SA 4860 a new jet ski and stated that it was for sale. SA 4860 said to work on the price and that SA 4860 may purchase it in the future. SA 4860 and CI 9725 then departed the residence. SA 4860 and CI 9725 entered the UCV. (It should be noted that SA 4860's body recording device failed during this transaction).

16. At approximately 6:16 PM, the UCV departed the deal location and turned off the recording equipment.  The firearm purchased was further described as, a Boito/Amantino/Iga, model Coach Gun, 12-gauge shotgun, serial number C982994-25. Included in the purchase were six (6) AR High-capacity magazines, and a tactical duffle bag.  The audio and video recordings were entered into evidence.

**Undercover Purchase of firearm from STOKES on May 5, 2026**

17. During the investigation, the CI met an individual later identified as Antony STOKES at 617 5th St, West Palm Beach, Florida, which was the same residence where the CI also interacted with DENMARK. Following that date, ATF SAs conducted an operational briefing to conduct an undercover controlled purchase from STOKES. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.

18. The transaction was arranged through telephone calls and text messages between CI 9725 and Antony STOKES, using STOKES' number (***) ***-2329. These conversations took place on May 5, 2026.

6

19.     On May 5, 2026, at approximately 1:53 PM, SA 4860 and SA 5073 departed from the pre-determined staging location in a UCV and activated the recording equipment. While driving to the location, CI 9725 called SA 4860 and informed him that STOKES said that he was close by.  At approximately 1:59 PM, SAs 4860 and UC 5073 arrived at 617 5th St, West Palm Beach, Florida, and parked across the street from the residence.  The UCs met with CI 9725, who was already at the location.  CI 9725 stood outside of the UCV while the group waited for STOKES to arrive.  SA 4860 observed a silver-colored Nissan VERSA arrive and park on the opposite side of the street.  CI 9725 went to the vehicle and made contact with STOKES.  STOKES retrieved an item from the rear seat that he had concealed in a towel. STOKES carried the item to the UCV. STOKES placed the item on the rear seat of the UCV, revealing an AR-15 type rifle.  STOKES stated that CI 9725 told him his associates did not need the magazine.  SA 4860 advised STOKES that they had purchased magazines yesterday. SA 4860 took possession of the firearm and inspected it briefly. STOKES advised that he had a jet ski for sale in the back yard of the residence. SA 4860 asked what caliber the firearm was.  STOKES stated that the firearm was 5.56 caliber. SA 4860 stated that he trafficked firearms and then SA 4860 asked STOKES for the price of the rifle. STOKES told SA 4860 the price was $900.00. SA 4860 counted $900.00 and gave it to STOKES, SA 4860 asked his name, and STOKES responded "Tony."

20.     SA 4860, SA 5073, and CI 9725, followed STOKES into the back yard of the residence. SA 4860 met the same black male as the previous day upon walking into the yard (this individual was present for the firearm deal on May 4, 2026).  SA 4860 observed several individuals (drug users) in the back yard.  SA 5073 examined the jet ski and discussed prices with STOKES. SA 4860 told STOKES that he trafficked firearms and moved them out of the country. STOKES told SA 4860 that he had wished he had met him earlier. SA 4860 provided his cellphone number

7

to STOKES and the two agreed to conduct firearm transactions in the future. SA 4860, 5073, and CI 9725, walked to the fence, which had to be unlocked by an unknown female, to allow them to exit. SA 4860 and 5073 returned to the UCV.  CI 9725 entered their vehicle and departed.

21.    At approximately 2:16 PM, the UCV departed the deal location and turned off the recording equipment.  The firearm purchased is further described as, SigSauer, model SIGM400, 5.56 caliber semi-automatic rifle, serial number 20L023490.  The audio and video recordings were entered into evidence

**Undercover Purchase of firearm from DENMARK on May 8, 2026**.

22.    ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.  The transaction was arranged through telephone calls and text messages between CI 9725 and DENMARK, using DENMARK's number. These conversations took place on May 8, 2026.

23.    On May 8, 2026, at approximately 12:22 PM, SA 4860 and SA 6021 departed from the pre-determined staging location in a UCV and activated the recording equipment.  CI 9725 was in telephonic contact with DENMARK.  At approximately 12:26 PM, SA 4860 and UC 6021 arrived at 617 5th St, West Palm Beach, Florida, and parked across the street from the residence. DENMARK walked to the driveway and motioned for the UCs to park in the driveway. SA 4860 moved the UCV and parked in the driveway. SA 4860 observed DENMARK return to the back yard and enter the rear structure. DENMARK then emerged from inside of the rear structure and began walking to the UCV. SA 4860 observed DENMARK concealing something inside of his pants. DENMARK entered the rear passenger seat of the UCV. DENMARK introduced himself

8

as "JoJo". DENMARK produced a pistol inside of a holster from inside of his pants. DENMARK gave the pistol to SA 4860. SA 4860 inspected the firearm, asked if it was loaded, which DENMARK responded "yes". The firearm was loaded (to include a round in the chamber).  SA 4860 counted $700.00 and gave the money to DENMARK.  DENMARK stated that he had items inside of the house that he wished to sell.  DENMARK asked SA 4860 and SA 6021, if the two were members of law enforcement. SA 4860 and SA 6021 denied working for law enforcement and DENMARK stated that he just needed to ask. DENMARK exited the vehicle and returned to the yard. SA 4860 departed the driveway.

24.     At approximately 12:31 PM, the UCV departed the deal location and turned off the recording equipment.  The firearm purchased is further described as, HiPoint, model C9, 9-millimter semi-automatic pistol, Serial number P10157507.  The firearm was loaded with eight (8) rounds of 9-millimeter ammunition, to include seven (7) in the magazine and one (1) in the chamber. The audio and video recordings were entered into evidence.

**Undercover Purchase of two (2) firearms from JULIEN on May 13, 2026**

25.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase. The transaction was arranged through telephone calls and text messages between CI 9725, DENMARK and JULIEN. These conversations took place on May 13, 2026.

26.     On May 13, 2026, at approximately 11:39 AM, SAs 4860 and SA 5073 departed from the pre-determined staging location in a UCV and activated the recording equipment. At approximately 11:45 AM, the UCV arrived at the residence and parked. SAs 4860 and 5073,

observed several males standing outside of the residence. SA 4860 observed DENMARK in the area, riding a bike. SA 4860 called CI 9725 and told CI 9725 to inform the person CI 9725 was in contact with that the UCs had arrived. The UCs observed an individual in a blue sedan across the street roll the rear window down. JULIEN (who was identified following the transaction) approached the vehicle. SA 4860 could see that JULIEN was concealing something inside of his waistband. JULIEN asked the agents if he should enter the UCV, the agents stated that he should. JULIEN entered the rear seat of the UCV, SA 4860 asked him what he had. JULIEN responded "mark", JULIEN produced a Ruger .22 caliber pistol from inside of his waistband. JULIEN handed SA 4860 the Ruger .22 caliber pistol, SA 4860 asked JULIEN if the pistol was loaded. JULIEN stated it was not. SA 4860 examined the firearm. SA 4860 asked JULIEN the price, JULIEN stated that he believed they had agreed on the price of $700.00. SA 4860 stated that he was informed he needed to pay him $100.00 for waiting for SA 4860 to arrive. SA 4860 explained that he trafficked the firearms out of the country. JULIEN stated that he had another firearm for sale. SA 4860 asked how much JULIEN wanted for the other pistol. SA 4860 and JULIEN agreed on the price of $700.00 for the second pistol. SA 4860 asked if the firearm was loaded, JULIEN stated that it was not. JULIEN stated that he had access to more firearms and would like to continue business in the future. SA 4860 counted $700.00 and gave it to JULIEN. JULIEN stated that all of his firearms were legitimate. SA 5073 exchanged phone numbers. DENMARK approached the UCV, SA 4860 greeted him, and provided him with $100.00 for brokering the firearms deal. SA 4860 provided DENMARK with his phone number. SA 4860 said goodbye to both JULIEN and DENMARK. item to the UCV.

27.     At approximately 11:48 AM, the UCV departed the deal location and turned off the recording equipment. The firearms purchased are further described as, a Ruger Mark IV, Model

10

Hunter 22, .22 caliber semi-automatic pistol, Serial #500046679, and a Ruger, Model American, .45 caliber semi-automatic pistol, Serial # 861-34224, with a magazine. The audio and video recordings were entered into evidence.

**Undercover Purchase of two (2) firearms from DENMARK and STOKES on May 15, 2026**

28.     On the above listed date, ATF Undercover (UC) Special Agent (SA) 5073 traveled to a residence located at 617 5th Street, West Palm Beach, Florida, to meet with DENMARK for the purchase of a firearm.  SA 5073 operated a UCV equipped with audio/video recorders and a transmitter which was monitored. The above meeting was arranged through a series of telephone calls and telephone text messages between ATF Confidential Informant (CI) 9725 and Sas 4860 and 5073 and DENMARK. The telephone number utilized by DENMARK is listed as (***) ***-3824.

29.     SA 5073 arrived to the residence at approximately 11:33 AM and made telephone contact with DENMARK.  DENMARK advised he would be outside shortly. A short time later, DENMARK emerged from the rear of the residence and entered the front passenger's seat of the UCV. DENMARK explained the source of the firearm, STOKES, would be arriving shortly.  As the conversation progressed, DENMARK stated he was contacted by STOKES "out of nowhere" indicating he had the firearm available for sale. SA 5073 acknowledged. DENMARK also stated he had another young associate that contacted him regarding a firearm being available for sale but noted the individual was young and therefore didn't want to get him into trouble for selling the firearm. DENMARK then advised there were rumors that SAs 5073 and 4860 were members of law enforcement. SA 5073 assured DENMARK the UCs were not members of law enforcement. DENMARK agreed. DENMARK went on to discuss his drug trafficking activities and stated he

and his associates sell drugs from the residence. Specifically, DENMARK stated he and his associates "trappin in the back."

30.     STOKES eventually arrived in a grey 2019 Nissan Versa bearing FL registration EAV8164[3]. The vehicle was occupied by STOKES and another unidentified individual. STOKES exited the Nissan Versa and entered the rear passenger seat of the UCV. As STOKES arrived, DENMARK requested that SA 5073 not tell STOKES that DENMARK was profiting from the sale of the firearm.  SA-5073 agreed.

31.     Once inside the UC vehicle, STOKES produced the firearm and handed the firearm to SA 5073. SA 5073 inspected the firearm provided which is described as a Sig Sauer Model P320C, 9-millimeter semi-automatic pistol, serial number 58B079070. The firearm was loaded with twelve (12) rounds of 9-millimeter ammunition.  SA 5073 attempted to negotiate the purchase price of the handgun. STOKES responded by saying the firearm belonged to his brother and he needed to provide the firearm at a price in which he (STOKES) could personally profit from the sale.  Specifically, STOKES stated, "Ahhh that's, this is my brother's so you feel me. I'm tryin to get my little cut you feel me." SA 5073 acknowledged. DENMARK commented on the quality of the firearm and questioned SA 5073 as to whether he had a license to possess firearms. SA 5073 responded by saying, "Fuck no, I got felonies." DENMARK and STOKES both laughed. STOKES then added, "That boy like me, what."  STOKES went on to say his brother did not have any "felonies", therefore he (STOKES) was going to utilize his brother to purchase firearms on behalf of STOKES. SA 5073 questioned STOKES as to whether his brother would be willing to take orders for specific firearms. STOKES responded in the affirmative. STOKES stated another

---

[3] A query shows the vehicle registered to STOKES at 1673 West 26th Street, Riviera Beach, FL.

associate was currently in possession of a revolver available for sale and added he would contact SA 5073 later on this date to arrange the sale of the firearm. SA 5073 advised DENMARK and STOKES that Sas 5073 and 4860 were interested in acquiring large quantities of firearms as they were further trafficking the firearms for profit.

32.     SA 5073 eventually paid STOKES $700.00 for the purchase of the handgun and arranged to meet later for the purchase of a second firearm. STOKES took the money provided and exited the UC vehicle shortly thereafter. STOKES re-entered the Nissan Versa and departed the area. DENMARK remained inside the UCV, at which time SA 5073 paid DENMARK the $100.00 for arranging the purchase of the firearm with STOKES.  DENMARK then exited the UCV and walked to the rear of the residence as observed by SA 5073. UC-5073 then departed the area.

33.     Later this same date, SA 5073 received a telephone call from DENMARK who indicated STOKES was in possession of another firearm available for sale. SA 5073 and DENMARK arranged to meet at DENMARK's residence for the purchase of the firearm.

34.     At approximately 2:49 PM, SA 5073 returned to DENMARK's residence and contacted DENMARK via telephone. DENMARK eventually emerged from the rear of the residence and approached the front passenger's door of the UCV. While standing at the open window of the UCV, DENMARK advised SA 5073 that STOKES was en route to the residence. DENMARK then returned to the rear of the residence only to emerge later to tell SA 5073 they would need to travel to meet with STOKES at an alternate location for the purchase of the firearm.

35.     DENMARK then entered the front passenger's seat of the UCV, and he and SA 5073 traveled to the Extended Stay America Select Suites hotel located at 2171 Tenth Avenue, Lake Worth, Florida to meet with STOKES for the sale of the firearm.

36.     At approximately 3:30 PM. SA 5073 and DENMARK arrived at the hotel and observed STOKES' Nissan Versa parked in the rear of the hotel parking lot. SA 5073 parked the UCV next to the Nissan Versa at which time STOKES exited his vehicle and entered the rear passenger seat of the UCV.  Once inside the UC vehicle, STOKES produced the firearm and handed the firearm to SA 5073. SA 5073 inspected the firearm provided, which is described as a Smith & Wesson Model Model 637, .38 caliber revolver, serial number DLE3428. The firearm was loaded with five (5) rounds of 38 caliber ammunition. STOKES indicated the purchase price of the firearm was $800.00. SA 5073 again explained he was not keeping the firearms as they were being further trafficked for profit. STOKES agreed to accept $600.00 for the purchase of the revolver at which time SA 5073 paid STOKES for the firearm. STOKES took possession of the money and exited the UCV. As STOKES was returning to the Nissan Versa, SA 5073 stopped STOKES and questioned him as to whether he could obtain quantities of crystal methamphetamine as relayed by DENMARK. STOKES responded in the affirmative and explained he would contact SA 5073 if he found the crystal methamphetamine available for sale.  The audio and video recordings were entered into evidence.

**Undercover Purchase of firearm from DENMARK and STOKES on May 18, 2026**

37.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase. The transaction was arranged through telephone calls and text messages between SA 5073, and DENMARK.

38.     On May 18, 2026, at approximately 11:33 AM, SAs 4860 and SA 5073 departed from the pre-determined staging UCV and activated the recording equipment. At approximately

14

11:38 AM, the UCV arrived at the residence and parked. SAs 4860 and 5073, waited in front of the residence for a brief time. At approximately 11:39 AM, DENMARK arrived at the UCV on an electric bicycle. DENMARK explained that he and his associates had several items for sale. DENMARK stated that an associate of his had a firearm for sale, but DENMARK believed the price was too high. SA 5073 asked DENMARK where STOKES was, DENMARK stated that he was in the rear of the residence. SAs 4860 and 5073 exited the UCV and followed DENMARK to the rear of the residence. Upon arriving at the rear of the residence, the SAs observed DENMARK, and STOKES. DENMARK showed the SAs a mini dirt bike he was looking to sell. STOKES and DENMARK also displayed a 360-degree camera they possessed to sell. STOKES stated that he wanted $300.00 for the camera. DENMARK walked over to SA 5073 and discretely provided him with a black pistol. SA 5073 handed the pistol to SA 4860 to inspect. SA 4860 asked the price of the pistol, STOKES stated "Seven" and DENMARK affirmed the price. SA 4860 asked if the firearm was loaded, STOKES informed him that it was not.

39.     STOKES then showed the SAs a 360-degree camera, STOKES stated that he wanted $300.00 for the camera.  DENMARK then began to show SA 4860 how the camera worked. DENMARK asked SA 4860 if he was a Federal Agent, which SA 4860 denied. DENMARK stated that he had heard that there was a strong law enforcement presence in the area. SA 4860 asked who was to be paid for the pistol and camera. SA 4860 paid DENMARK $300.00 for the camera (to avoid suspicion of only purchasing firearms from a group who was selling various other items). SA 4860 then paid STOKES $700.00 for the pistol. SA 4860 then provided $100.00 to DENMARK as a brokerage fee for the firearm transaction. SA 4860 told DENMARK that he was trafficking firearms outside of the country. SA 5073 and STOKES had a conversation

about obtaining other firearms in the future. All parties said goodbyes. SA 4860 and 5073 returned to the UCV.

40.     At approximately 11:44 AM, the UCV departed the deal location and turned off the recording equipment. The firearm purchased is further described as, a Beretta, Model 70S, .380 caliber semi-automatic pistol, serial number A47525Y.   Also purchased was a Digital Video Recorder (360-degree camera).   The audio and video recordings were entered into evidence.

**Undercover Purchase of firearm from DENMARK and STOKES on May 20, 2026**

41.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.   The transaction was arranged through telephone calls and text messages between SA 5073 and DENMARK.   These conversations took place on May 20, 2026.

42.     On May 20, 2026, at approximately 7:40 PM, SA 4860 departed from the pre-determined staging location in a UCV and activated the recording equipment. At approximately 7:47 PM, SA 4860 arrived at the location and parked the UCV. SA 4860 exited the UCV and asked for DENMARK. At approximately 7:48 PM, STOKES and DENMARK arrived at the UCV. STOKES entered the rear of the UCV and DENMARK sat in the front passenger seat. SA 4860 greeted the two and stated that he heard that STOKES' associate had sold a firearm earlier. STOKES confirmed it. STOKES produced a revolver from inside of his waistband. SA 4860 inspected the firearm and asked the price. STOKES said he wanted $1,300.00. The three negotiated and settled on the price of $500.00. SA 4860 paid STOKES $500.00. SA 4860 then handed

DENMARK $100.00 as a brokerage fee. SA 4860 and the two said goodbyes, STOKES and DENMARK exited the UCV.

43. At approximately 7:50 PM, the UCV departed the deal location and turned off the recording equipment. The firearm purchased is further described as, ROHM, model 57, .357 caliber revolver, serial number LB5587. The audio and video recordings were entered into evidence.

### Undercover Purchase of two (2) firearms from JULIEN, DENMARK and STOKES on May 21, 2026

44. ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase. The transaction was arranged through telephone calls and text messages between SA 5073, and DENMARK. Ultimately the transaction arranged with DENMARK did not occur at his residence. Instead, SAs met with JULIEN to conduct the firearms transaction.

45. On May 21, 2026, at approximately 1:40 PM, SA 4860 and SA 6021 departed from the pre-determined staging location in an undercover vehicle (UCV) and activated the recording equipment. At approximately 1:43 PM, the UCV arrived at the residence and parked. SAs 4860 and 6021 exited the UCV and walked to the rear of the residence. Upon arriving at the rear of the residence, the SAs observed JULIEN seated in a chair. SAs observed three additional unknown black males congregating at the opposite end of the rear. Then, SA 4860 approached JULIEN and asked where DENMARK was. SA 4860 explained to JULIEN that SAs were there to conduct a firearms transaction with DENMARK. Then, JULIEN told SAs that he may be on his way back to

17

the residence. Then, JULIEN retrieved a pistol from inside his pants and placed it on his lap.  SAs asked JULIEN if he was willing to sell them the firearm. JULIEN stated that he was willing to trade his firearm for another firearm. Then, SA 4860 explained that SAs purchase firearms to resell, and trafficked the firearms outside of the country. Then, SA 6021 asked JULIEN how much he was willing to sell his firearm for. Then, JULIEN told SAs he was willing to sell the firearm for $100.00 more than the previous firearm he sold to SA 4860 ($700.00). Then, SA 4860 told JULIEN that they were willing to purchase the firearm from JULIEN for $800.00, to which JULIEN agreed. SA 4860 provided JULIEN with $800.00 in ATF funds for the firearm.  SAs departed the rear of the residence and returned to the UCV.  Shortly after, SAs departed the deal location and turned off the recording equipment.

46.     On this same date, DENMARK contacted SA 5073 to inform them that he had a rifle he was willing to sell to them. SA 5073 agreed to purchase the firearm and informed DENMARK that SA 4860 would meet him at his residence to conduct the transaction. These conversations were recorded.  On this same date, at approximately 2:58PM, SAs activated their recording equipment.

47.     At approximately 3:00PM, SAs arrived at DENMARK's residence. Then, SA 4860 placed a phone call to DENMARK to advise him they had arrived, but DENMARK did not answer. SA 4860 exited the UCV and approached DENMARK's residence.  SA 4860 did not see anyone in the yard of the residence, SA 4860 returned to the UCV. Then, SA 5073 placed a phone call to DENMARK to inform him SAs were outside of his residence. DENMARK told SA 5073 that he was inside the residence and would meet with SAs shortly.

48.     On this same date, at approximately 3:14PM, SAs observed DENMARK exit his residence, approach the UCV, and get into the back seat.  DENMARK then informed SAs that his

associate (STOKES) had the rifle and SAs would have to travel to the area of 26th St. and Blue Heron in Riviera Beach to conduct the firearms transaction. Then, SAs along with DENMARK departed the area and traveled to 1657 W 26th St., Riviera Beach, FL.

49.     On this same date, at approximately 3:35PM, SAs and DENMARK arrived and DENMARK had SA 4860 place call to STOKES to advise them they had arrived. STOKES told SAs that park in the driveway next to his vehicle.  DENMARK then exited the UCV and met with STOKES at his vehicle.  DENMARK returned to the UCV and entered the back seat.  SA 4860 provided DENMARK with $100.00 in ATF funds for facilitating the firearms transaction with STOKES.  STOKES then approached the UCV, carrying a disassembled AR Style Rifle, and entered the back seat of the UCV.  STOKES told SAs "I got some shit with binary trigger on that bitch…and a 50 rounds drum."  STOKES then handed the rifle components to SAs to inspect.  SA 6021 secured the rifle and SA 4860 asked STOKES if he was willing to accept less money than the agreed upon price. STOKES told SA 4860 that he was willing to accept $2,300.00 for the rifle, to which SA 4860 agreed.  SA 4860 provided STOKES with $2,300.00 in ATF funds for the rifle. STOKES told SAs that he was able to provide them with additional firearms in the future. SAs explained to STOKES that they trafficked firearms "Up north…across the border" [Canada] and preferred purchasing firearms from STOKES in bulk. STOKES agreed and told SAs he would have additional firearms for sale the following week.  STOKES and DENMARK then exited the UCV and returned to STOKES' vehicle.  It should be noted that prior to DENMARK leaving, SA 4860 paid him $100.00 as a brokerage fee for the JULIEN firearm transaction earlier in the day. Then, SAs departed the area. Shortly after, SAs turned off all recording devices.

50.     The firearm purchased from JULIEN is further described as, a SAR Arms, Model SAR 9C, 9mm caliber semi-automatic pistol, serial number T110222C602124, with fourteen (14)

rounds of 9mm ammunition). The audio and video recordings for JULIEN were entered into evidence. The firearm purchased from STOKES is further described as a P80, 5.56 caliber semi-automatic rifle, with a high-capacity magazine. The audio and video recordings for STOKES and DENMARK were entered into evidence.

**Undercover Purchase of firearm from DENMARK on May 22, 2026**

51.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.  The transaction was arranged through telephone calls and text messages between SA 5073 and DENMARK.

52.     On May 22, 2026, at approximately 11:55 AM, SAs 4860 and SA 5073 departed from the pre-determined staging location in a UCV and activated the recording equipment. SA 5073 spoke with DENMARK who advised him to come to the residence and to the back, as the gate was unlocked.

53.     At approximately 11:57 AM, the UCV arrived at the residence and parked. SAs 4860 and 5073, walked to the back of the residence as instructed by DENMARK.   At approximately 11:58 AM the UCs exited the UCV and walked to the rear of 617 5th Street. The UCs entered the backyard area of the residence. The UCs observed DENAMRK, JULIEN and other unidentified individuals in the back yard area. DENMARK was observed in the rear residence of 617 5th Street.  SA 4860 entered the rear residence and met with DENMARK in the kitchen.  DENMARK produced a ski mask and began looking for something inside of it with his hand.  DENMARK produced a .380 pistol from inside of the ski mask.  DENMARK gave the pistol to SA 4860; SA inspected the pistol and asked the price.  DENMARK stated that the owner

20

of the firearm wanted $650.00, DENAMRK then said he would charge SA 4860 $550.00, because they were doing good business. SA 4860 counted $700.00 and placed it on the counter for DENMARK. SA provided DENMARK with $550.00 was for the firearm, $100.00 brokerage fee for DENMARK and $50.00 since SA 4860 only had $100 bills. SA 4860 and DENMARK agreed to do business in the future.

54.     At approximately 12:01 PM, the UCV departed the deal location and turned off the recording equipment.   The firearm purchased is further described as, a Diamondback Arms, DB380, .380 caliber semi-automatic pistol, serial number ZL6849.   The audio and video recordings were entered into evidence.

### Undercover Purchase of three (3) firearms from HARRY, DENMARK and STOKES on May 26, 2026

55.     ATF SAs conducted an operational briefing prior to the undercover controlled purchase. ATF provided the prerecorded Agent Cashier Funds (ACF), (buy money/U.S. Currency) for the undercover purchase prior to the operation, and ATF personnel conducted both mobile surveillance and audio electronic surveillance of the undercover purchase.

56.     The transaction was arranged through telephone calls and text messages between SA 5073, and DENMARK. There were conversations between SA 4860 and both STOKES and DENMARK.

57.     On May 26, 2026, at approximately 3:39 PM, SA 4860 departed from the pre-determined staging location in a UCV and activated the recording equipment. SA 4860 spoke with STOKES who advised him to come to the residence and stated that he was in his vehicle. SA 4860 observed a gray colored Nissan vehicle backing up into the driveway. STOKES stated that he

needed to get the firearm from his residence. SA 4860 and STOKES exchanged greetings. STOKES walked to and entered a white door on the first floor of the residence at 1673.

58.     SA 4860 observed Deonte HARRY near the residence and did not believe him to be associated with the transaction at the time. STOKES exited the residence, carrying a red bag, and made contact with HARRY. STOKES and HARRY both walked to the UCV. STOKES and HARRY lingered outside of the UCV for a few moments. STOKES entered the front seat of the UCV. STOKES stated that he thought a black SUV that had passed by was a police vehicle. STOKES entered the UCV carrying the red bag. HARRY stood near the front passenger door of the UCV.  HARRY passed a pistol to STOKES, who passed the pistol to SA 4860. SA 4860 and STOKES talked about prices for the two firearms. SA 4860 inspected the pistol and then inspected the shotgun. SA 4860 asked HARRY if he wanted $800.00, HARRY nodded in the affirmative. STOKES told HARRY to get into the rear of the UCV.  SA 4860 paid HARRY $800.00 for the pistol.  HARRY stated that he might have more firearms for sale in the future.  HARRY exited the UCV and stated that his name was "JEFE." SA 4860 and STOKES negotiated a price of $1,300.00 for the shotgun. STOKES asked SA 4860 if he had spoken to DENMARK, SA 4860 affirmed he had.  SA 4860 counted $1,300.00 and gave it to STOKES to count. SA 4860 explained that he trafficked firearms outside of the country and provided them to individuals involved in a gang war. SA 4860 also explained that he would obliterate the serial numbers on the firearms. STOKES stated that he understood. The two agreed to conduct future firearms transactions. SA 4860 and STOKES spoke about taking care of DENMARK for setting up the firearm deals. STOKES exited the UCV.

59.     SA 4860 departed the area and at approximately 3:48 PM, turned off the recording equipment.

60.     On this same date, at approximately 4:00 PM, SA 4860 activated the electronic surveillance equipment. At approximately 4:07 PM, SA 4860 made contact with an unknown male and told him to tell DENMARK he was outside. SA 4860 called DENMARK and told him that he was outside. At approximately 4:10 PM, DENMARK arrived at the UCV. SA 4860 paid DEMARK $200.00 as a brokerage fee for the two firearms purchased from STOKES and HARRY. At approximately 4:11 PM SA 4860 departed the area and turned off the recording equipment.

61.     On this same date, at approximately 5:43 PM, SA 4860 and SA 5073 departed from the pre-determined staging location in a UCV and activated the recording equipment. At approximately 5:47 PM, SA 4860 spoke to STOKES and told him that SA 4860 had arrived. SA 4860 parked the UCV in the parking area at 1665 W 26th Street, Riviera Beach, FL. At approximately 5:55 PM, STOKES arrived in a gray Nissan sedan. STOKES exited the driver seat of the Nissan and entered the rear of the UCV. STOKES produced a pistol and handed it to SA 4860. SA 4860 inspected the pistol and stated it was loaded. STOKES then informed SA 4860 that the pistol was loaded. SA 4860 and STOKES negotiated a price of $900.00 for the pistol. SA 4860 counted the money and handed $900.00 to STOKES and told him to count it. All parties said goodbye and STOKES exited the UCV.

62.     At approximately 5:56 PM, the UCV departed the deal location and turned off the recording equipment. At approximately 6:11 PM, SA 4860 and SA 5073 activated the electronic surveillance equipment. SA 4860 spoke to DENMARK on the phone and advised him that there was a heavy police presence in the area. DENMARK told SA 4860 to park in the driveway. Another individual opened the gate, and DENMARK walked to the UCV. SA 4860 paid DENMARK $100.00 as a brokerage fee for setting up the transaction with STOKES.

63.     At approximately 6:18 PM, SAs 4860 and 5073 departed the area and turned off the recording equipment.  The firearms purchased are further described as, a Taurus, Model G3C, 9-millimeter semi-automatic pistol, serial number ACH158276, with a high capacity magazine, a Mossberg, Model 590, 12 gauge shotgun, serial number V1530069 with five (5) rounds of assorted 12 gauge ammunition, and a Glock, Model 26, 9-millimeter semi-automatic pistol, an obliterated serial number, with a high capacity magazine, containing nineteen (19) rounds of 9-millimeter ammunition.  The audio and video recordings were entered into evidence.

64.     Based on your affiant's training and experience, all fifteen (15) firearms and sixty-three (63) rounds of assorted caliber ammunition which were purchased and referenced in this warrant were examined by an ATF Nexus Expert, who determined they were not manufactured in the state of Florida and therefore affected interstate and/or foreign commerce. The firearms were also test fired and were deemed operable. Furthermore, neither DENMARK, JULIEN, nor STOKES are licensed firearm dealers, manufacturers, importers, or exporters, such that they can sell, transfer, or deliver the firearm described herein to a person in another state or country.

65.     Prior to these undercover purchases, DENMARK and HARRY had each previously been convicted of a crime punishable by more than one year in prison and are therefore prohibited from possessing firearms.  DENMARK and HARRY have not had their civil rights restored nor had received a pardon for any of their prior felony convictions.

## CONCLUSION

66.     Based on the aforementioned facts, I respectfully submit that there is probable cause to support the arrest of DENMARK, JULIEN and STOKES for  conspiracy to traffic firearms and trafficking firearms, in violation of Title 18, United States Code, Sections 933(a)(3) amd (1); and DENMARK and HARRY for possession of a firearm and ammunition by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1).


**FURTHER YOUR AFFIANT SAYETH NAUGHT**

_____
JUSTIN HERZLICH, SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES


Attested to by the Affiant in accordance with
the requirements of FED. R. CRIM. P. 4.1 by
FaceTime on this 23 day of June 2026.

_____
HONORABLE RYON M. McCABE
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**: Joseph Denmark

**Case No**:

Count #:

<u>Conspiracy to traffic firearms and trafficking firearms</u>

<u>Title 18 U.S.C. §§ 933 (a)(3) and (1)</u>
**\* Max. Term of Imprisonment: 15 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**
**\* Special Assessment: $100**

Count #:

<u>Possession of a firearm and ammunition by a convicted felon</u>

<u>Title 18 U.S.C. § 922(g)(1)</u>
**\* Max. Term of Imprisonment: 15 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**
**\* Special Assessment: $100**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: Derick Julien

**Case No**:

Count #:

Conspiracy to traffic firearms and trafficking firearms

Title 18 U.S.C. §§ 933 (a)(3) and (1)
* **Max. Term of Imprisonment: 15 years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: Antony Stokes

**Case No**:

Count #:

Conspiracy to traffic firearms and trafficking firearms

Title 18 U.S.C. §§ 933 (a)(3) and (1)
* **Max. Term of Imprisonment: 15 years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100**

Count #:

Possession of a firearm and ammunition by a convicted felon

Title 18 U.S.C. § 922(g)(1)
* **Max. Term of Imprisonment: 15 years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: Deonte Harry

**Case No**: 

Felon in possession of a firearm

18 U.S.C. § 922(g)(1)
* **Max. Term of Imprisonment: 15 years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**